UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| TERRAL RIVERSERVICE, INC. | CIVIL ACTION NO. 3:22-CV-5780 |
|    Plaintiff | |
| VERSUS | JUDGE |
| UNITED STATES OF AMERICA | MAGISTRATE JUDGE |
|    Defendant | |

## **COMPLAINT**

Terral RiverService, Inc., (Terral River), through Counsel, asserts the cause of action to be hereafter stated against the United States of America (United States).

1. Terral River is a Louisiana Corporation whose office and principal place of business is located in Lake Providence, Louisiana.

2. At all relevant times here, the United States owned the structure hereafter called Kentucky Lock.

3. At relevant times here, Terral River owned and operated an Inland River towing vessel called the M/V Amy Gattle as well as a barge named/numbered TRS 223B.

4. At relevant times here, the United States, through persons employed by the United States Army Corps of Engineers, (called lock operators or lock tenders) operated Kentucky Lock.

5. This Court has jurisdiction to hear/decide this case pursuant to the Suits in Admiralty Act – 46 U.S.C § 741-742.

6. Kentucky Dam, located at Mile 22 on the Tennessee River, blocks the flow of the Tennessee River; river water blocked by Kentucky Dam which has accumulated upriver from Kentucky Dam is called Kentucky Lake.

7. Kentucky lock is a structure that penetrates Kentucky Dam and is designed to allow towing vessels/barges being pushed by Towing Vessels on the Tennessee River to pass through Kentucky Dam, in up river and down river bound directions.

8. On Saturday, July 11, 2022, Terral River's m/v Amy Gattle sought to pass through Kentucky Dam, through Kentucky lock, in a downriver bound direction, pushing a tow of 15 loaded barges, made up (arranged) 3 wide and 5 long.

9. The lock chamber at Kentucky lock is 600 feet in length and 110 in width.

10. The length of the Amy Gattle's 5 barge tow approximated one thousand feet; the Amy Gattle was 148 feet in length; the total length of this flotilla, consisting of the Amy Gattle and her tow, was approximately 1150 feet.

11. Since the length of the Amy Gattle/her tow exceeded the length of the lock chamber at Kentucky Lock, it was necessary for the Amy Gattle's captain/pilot to "double trip" Kentucky lock.

12. Vessels navigating on the Tennessee River, pushing tows of lengths that exceed the 600' length of Kentucky Lock's lock chamber, routinely are called upon to "double trip" this lock, in order to proceed past Kentucky Dam, which in this case involved:

    a. The Amy's pilot/captain placed the forward 9 barges in the Amy's tow, into the Kentucky lock's lock chamber, after Kentucky Lock/s lock operator/lock tender opened the locks upriver lock gates.

    b. Kentucky locks lock operator/lock tender then closed Kentucky Lock's upstream lock gates (after such 9 barges were placed in Kentucky lock's lock chamber.)

    c. Kentucky Lock's lock operator/lock tender then activated pumps/valves to remove water from the lock chamber to lower the water level in the lock chamber, from the level of the Tennessee River upriver from Kentucky Dam, to the level of the Tennessee River downstream from Kentucky Dam.

    d. When the water level in the lock chamber reached the level of the Tennessee River on the downstream side of Kentucky Dam, Kentucky Lock's lock operator/ lock tender intended to open Kentucky Lock's downstream lock gates and remove the 9 "first cut" of barges the Amy Gattle's tow from the lock chamber.

    e. Kentucky Lock's lock operator/lock tender then planned to close the downstream lock gates (after the 1st cut of barges were removed from the chamber) and pump water back into the lock chamber to where the water level in the Lock chamber to the level of the Tennessee River upstream from Kentucky Dam and the locking of the m/v Amy Gattle and her remaining 6 barges could then be accomplished.

13. On July 11, 2022, the Amy placed her "first cut" of barges in Kentucky Lock's lock chamber; her deck crew secured this 9-barge block of barges to floating mooring bits, located in recesses in the lock wall; the Amy/her remaining 6 barges backed out of the Lock chamber, and assumed a position upstream from the lock chamber awaiting the locking of the Amy's 1st cut of barges.

14. The Amy's crew positioned the stern (the upstream end) of this 9-barge cut of barges in the lock chamber at a location downstream from a yellow line – that was painted on Kentucky lock's lock wall.

15. This yellow line, painted on this lock wall, marked the distance into which a miter sil, located on the floor of the lock chamber, protruded into the lock chamber itself.

16. The purpose of this yellow line was to apprise vessel crew people, in charge of positioning barges in the lock chamber, as well as Kentucky Lock's lock operator/lock tender in charge of "locking" this 9-barge cut of barges through this lock chamber, of the distance to which this miter sill protruded into the lock chamber - because the miter sil's protrusion into the lock chamber posed a recognized hazard, an avoidable danger, to barges/vessels being locked through Kentucky lock, in a downstream direction.

17. It was the responsibility of Kentucky lock's operator/lock tender, in charge of locking this 9-barge cut of barges through Kentucky lock, to determine that the stern of this 9-barge tow was positioned at a location downstream from this yellow line on this lock wall - before such lock operator/lock tender proceeded to manipulate valves/to activate pumps that would initiate removal of water from the lock chamber.

18. It was the responsibility of Kentucky Lock's lock operator/lock tender to determine, before manipulating valves/pumps to remove water from the lock chamber, that the Amy's first cut of barges were positioned in the lock chamber at a location where such barges would not be endangered by the presence of the miter sil, that protruded into the lock chamber as the barges were being lowered in the lock chamber by the pumping of water from the lock chamber.

19. It was the responsibility of Kentucky Lock's lock operator/lock tender to determine, before activating pumps/valves that removed water from the lock chamber, that as these 9 barges dropped in the lock chamber, as the level of water in the lock chamber dropped, that these barges were not in a position to where they would make contact with/would "hang up" on this protruding miter sil.

20. It was the responsibility of the Kentucky Lock's lock operator / lock tender to select settings on the valves/pumps that removed water from the lock chamber – and lowered the level of water in the lock chamber – that would minimize turbulence in the lock chamber to avoid/to minimize any "surge "of these 9-barges caused by such turbulence.

21. It was Kentucky Lock's lock operator/lock tender's responsibility to continuously visually monitor the position of barges in the lock chamber, after initiating the removal of water from the lock chamber, throughout the time that water was being pumped from the lock chamber, to make sure that these barges did not assume a position to where they would be endangered by the presence of this protruding miter sil.

22. Kentucky Lock's lock operator/lock tender closed the upstream lock gates and activated valves/pumps that controlled the rate at which water was removed from the lock chambers, without first determining that the Amy's first cut of barges was in a proper/safe position with respect to such yellow line / with respect to miter sil that was protruding into the lock chamber.

23. Kentucky Lock's lock operator/lock tender set the valves/pumps that controlled the rate at which water was pumped from the lock chamber at rates which produced excess turbulence in the lock chamber itself which caused the 9-barge cut of barges to surge as they dropped in the lock chamber as water was removed/pumped from the chamber.

24. Kentucky Lock's lock operator/lock tender left the lock operator/lock tender upstream lock station, after activating pump to remove water from the chamber and made no attempt to visually monitor the positions of the 9-barge cut of barges, in the lock chamber, as water from the chamber was being pumped from the chamber, as these barges were being lowered, in a downward direction, toward the protruding miter sil.

25. As the water level in the lock chamber receded, the cut of barges from the Amy's tow dropped in the lock chamber, to an elevation to where the stern (the upriver end) of TRS 223 "hung up"/became impaled upon the protruding miter sil, which caused the stern of the barge to rise, as water continued to be pumped from the chamber which caused water to flow into the bow of TRS 223B, which sank TRS 223 in the lock chamber.

26. An Amy Gattle crew member was aboard TRS 223 when the stern of such barge "hung up" on the protruding miter sil.

27. Such crew person attempted to call Kentucky Lock's lock operator/lock tender via radio on the radio channel that Kentucky lock operator/lock tender was required to continuously monitor during locking - to advise such lock operator/lock tender of the emergency that existed and to request that pumps that were continuously discharging water from the lock chamber to be immediately shut down.

28. Kentucky Lock's lock operator/lock tender was not monitoring his radio when this crew person made this call and as the result such lock operator/lock tender failed to timely respond to this repeated emergency.

29. Had such lock operator/lock tender monitored his radio and promptly to shut down the lock's pumps, perhaps the sinking of TRS 223 could have been prevented.

30. But when such lock operator/lock tender finally responded to the Amy's crew persons emergency radio calls, Amy Gattle crew people discovered that the Kentucky Lock's lock operator/lock tender was not even present at the upstream end of the lock chamber, was not in a position to visually monitor the locking of these barges as they dropped in the lock chamber, toward the protruding miter sil – but instead, such lock operator/lock tender was at the downstream end of the lock chamber – visiting with person's fishing below the lock.

31. Kentucky Lock's lock operator/lock tender could not immediately stop the flow of water from the lock chamber from the location occupied by such lock operator/lock tender at the times when such the Amy's crew person attempted to reach the lock operator/lock tender by radio.

32. And after the lock operator/lock tender finally answered the Amy's crew person's radio call, such lock operator/lock tender proceeded to sprint from the downstream end of the lock chamber, back to the upstream end of the lock chamber – to shut down the pumps which had been removing water from the chamber.

33. The sinking of TRS 223 was proximately cause by multiple negligent acts/omissions, here identified, on the part of Kentucky Lock's lock operator/lock tender on duty at the times here discussed.

34. The United States is liable for such negligence.

35. As proximate result of such negligence, Terral River sustained economic damages, including but not limited to the loss of TRS 223, which was rendered a total loss as the result of this sinking.

36. Wherefore, Terral River seeks recovery from the United States of America for damages it sustained in salvaging/removing its sunken TRS 223 from the floor of Kentucky Lock's lock chamber presently believed to be in the amount of $94,450.00 as well as the fair market value of TRS 223 of $595,600.00, for a total of $690,050.00, plus prejudgment interest and costs.

        s/ David P. Doughty
        DAVID P. DOUGHTY, BAR NO. 18871

        **COTTON, BOLTON, HOYCHICK & DOUGHTY, L.L.P.**
        607 Madeline Street ~ P. O. Box 857
        Rayville, Louisiana 71269
        Telephone (318) 728-2051
        Facsimile (318) 728-5293
        E-mail: ddoughty@cottonbolton.com

        Attorney for Terral RiverService, Inc.

Of Counsel:

Frank S. Thackson, Jr.
Health S. Douglas
**Lake Tindall, LLP**
127 South Poplar (38701)
P. O. Box 918
Greenville, MS 38702-0918
Telephone (662) 378-2121
Facsimile (662) 378-2183
E-mail: fthackston@ltindall.com
E-mail: hdouglas@ltindall.com

Attorneys for Terral RiverService, Inc.